### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KEITH BILYARD, ET AL., | ) | 3:21-CV-00845 (SVN) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEONDRE PIERCE, ET AL., | ) | |
| *Defendants*. | ) | February 13, 2024 |

## <u>RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Sarala V. Nagala, United States District Judge.

Plaintiffs Keith Bilyard and Jane Bilyard have brought this action alleging that Defendants, Southbury Police Officers Deondre Pierce, Brianna Critelli, Elizabeth Alfano, and Whitney Carter,[1] violated their Fourth Amendment rights by using unreasonable force against them while executing a wellness check on Keith Bilyard at their home. Mr. Bilyard brings claims for excessive force and failure to intervene against Officer Pierce, and Mrs. Bilyard brings claims for excessive force and failure to intervene against Officers Critelli, Alfano, and Carter.[2]

Defendants seek summary judgment on all claims, contending primarily that, based on the undisputed material facts, the force used was not excessive under the Fourth Amendment.

---

[1] Plaintiffs' complaint also named a "John Doe" defendant, whom Plaintiffs identified at oral argument as the Sergeant from the Connecticut State Police ("CSP") who was involved in the incident. The Court dismissed the Doe defendant from this action, without objection, after Plaintiffs conceded he has not been served in the more than two years since this case was filed. *See* Fed. R. Civ. P. 4(m) (requiring service within 90 days); Pls.' Br., ECF No. 38 at 2 (stating that "Resident State Trooper" who allegedly participated in use of force is not "named as a defendant"); Order, ECF No. 57 (dismissing John Doe defendant).

[2] Although Plaintiffs' complaint is unclear as to which of Plaintiffs' claims are brought against which Defendants, Plaintiffs' opposition to Defendants' motion for summary judgment, ECF No. 38, clarifies that Mr. Bilyard brings claims against Officer Pierce and Mrs. Bilyard brings claims against the other Defendants. *See id.* at 2–3. Further, the opposition concedes that "[a]lthough the plaintiffs have appropriately alleged that the defendants unlawfully entered their home, this case actually concerns and is limited to their claims of unreasonable force." *Id.* at 3. In addition, the opposition makes no mention of the assault and battery claims included in the complaint, and as to which Defendants sought summary judgment. Thus, the Court does not address any unlawful entry, assault, or battery claims, as these claims have been abandoned by Plaintiffs either expressly or by omission. *See Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn. 2009) (recognizing that claims not addressed in an opposition to summary judgment may be deemed abandoned).

Defendants also argue that, even if Plaintiffs' constitutional rights were violated, they are entitled to a finding of qualified immunity, as their actions were objectively reasonable under the circumstances. Plaintiffs counter that there are material facts in dispute which preclude summary judgment.

For the reasons set forth below, Defendants' motion is GRANTED in part, as to the failure to intervene claim against Officer Pierce, and otherwise DENIED.

## I.      FACTUAL BACKGROUND[3]

On the morning of October 11, 2019, Mr. Bilyard had an appointment with clinical psychologist Dr. Catherine Schmidt at the Yale New Haven Health Center, to whom he had been referred by his primary care physician. Defs.' L.R. 56(a)1 St. ¶¶ 1, 2. The parties dispute exactly what Mr. Bilyard said during that appointment, but Dr. Schmidt's notes from that appointment state that she understood him to have "made a vague statement about not being alive in 2 weeks," that caused her concern, despite not knowing whether he suffered from suicidal ideations. *See* Defs.' Mot. for Summ. J., Ex. D, ECF No. 34-1[4] at 2. After a few unsuccessful attempts to reach Mr. Bilyard, Dr. Schmidt called Jane, Mr. Bilyard's wife, to express her concerns. Defs.' L.R. 56(a)1 St. ¶¶ 5, 6.

The parties dispute what happened next, but the record makes clear that at some point Dr. Schmidt called a Medical Crisis Team ("MCT"), who went to check on Mr. Bilyard at the Bilyards' home, but did not enter or make contact with him. Defs.' Mot. for Summ. J., Ex. G, ECF No. 34-

---

[3] The factual background is taken primarily from Defendants' Local Rule 56(a)1 Statement, ECF No. 32-2 ("Defs.' L.R. 56(a)1 St."), because Plaintiffs' L.R.56(a)2 Statement, ECF No. 39, does not comply with Local Rule 56(a)2, which requires a "reproduction of each numbered paragraph in the moving party's Local Rule 56(a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c)." The facts are undisputed by Plaintiffs, however, unless otherwise indicated.
[4] Portions of the exhibits submitted in support of Defendants' motion for summary judgment were sealed by the Court for privacy reasons. *See* Order, ECF No. 35 (sealing ECF No. 34). Although the Court references a few portions of the sealed records, it need not unseal the records at this time, as the portions referenced are simply the underlying evidentiary support for information submitted on the public record.

3 at 2.  The MCT called the on-call line at Yale to notify the hospital it did not complete the check, *id.*; *see also* Defs.' Mot. for Summ. J., Ex. B, ECF No. 34 at 62, at which point Dr. Katherine McKenzie, the on-call physician, called the Southbury Police Department and requested they perform a wellness check.  ECF No. 34 at 62; *see also* Defs.' Mot. for Summ. J., Ex. E, ECF No. 34-2 (audio recording of call).[5]  Officers Pierce and Alfano were then dispatched to Plaintiffs' residence.  Defs.' L.R. 56(a)1 St. ¶ 13.  While en route, they were advised that the MCT was on the way as well, having again been contacted by the hospital.  *Id.* ¶ 14.

Around this time, Mr. Bilyard was inside his home and did not investigate an outdoor alarm that went off because he assumed it was his wife arriving at the home.  *Id.* ¶ 17.  Instead, he went upstairs, and did not answer the door when the officers knocked for three minutes.  *Id.* ¶¶ 17–19.  Mrs. Bilyard then arrived home and, after the officers advised her of the comments Mr. Bilyard had made to the doctor, she went into the house to speak to Mr. Bilyard.  *Id.* ¶¶ 20–22.  She advised Mr. Bilyard that officers were at the house and wanted to speak with him, but Mr. Bilyard asked her to go back down and tell the officers he did not need to speak with them.[6]  *Id.* ¶¶ 23–24.  Officers Pierce and Alfano then entered the residence.  *Id.* ¶ 25.

---

[5] Plaintiffs dispute that Dr. McKenzie sought the Southbury Police Department's assistance with conducting a wellness check on Mr. Bilyard, citing to a portion of Mr. Bilyard's deposition testimony noting that he never personally spoke with Dr. McKenzie.  ECF No. 39 at 1.  But Plaintiffs offer no alternative version of these events, nor provide any reason to dispute the evidence submitted by Defendants, which includes an audio recording of Dr. McKenzie's call to the police department in which she acknowledges that the troubling comments were made by Mr. Bilyard to a colleague, and she was simply the on-call physician following up to request the wellness check.  *See* ECF No. 34-2 (manually filed).

[6] In his deposition, Mr. Bilyard testified that he had had prior experience with two Defendants, Officers Alfano and Critelli, in a criminal trial that had ended a few weeks earlier.  K. Bilyard Dep. Tr., ECF No. 40, at 71:15–72:23.

Mr. Bilyard was on the landing at the top of the stairs, and Officer Pierce ordered Mr. Bilyard to come downstairs. *Id.* ¶ 26. Mr. Bilyard remained upstairs and did not comply with Officer Pierce's orders. *Id.*[7]

At some point around this time, the MCT arrived. *Id.* ¶ 27. The parties dispute what the MCT heard and saw going on in the house when they arrived, but it is undisputed that they waited outside while the interaction with the officers continued. *Id.* ¶ 31.

Thereafter, the CSP Sergeant arrived at the bottom of the staircase. *Id.* ¶ 32. Officer Pierce yielded to him, and he advanced up the staircase with his Taser pointed at Mr. Bilyard. *Id.* ¶ 33–34. As the CSP Sergeant advanced, Mr. Bilyard said that he would defend himself.[8] *Id.* ¶ 36. Mr. Bilyard then, at least briefly, picked up what he describes as a letter opener from the desk near him at the top of the stairs, K. Bilyard Dep. Tr. at 107:10, and what Officer Pierce's police report describes as a "large knife," Defs.' Mot. for Summary Judgment, Ex. F, ECF No. 32-8 at 3. Mr. Bilyard testified that he "picked it up" but could not hold it due to a preexisting medical issue with his hands. K. Bilyard Dep. Tr. at 107:10–16. At some point, the CSP Sergeant holstered his Taser and unholstered his firearm, which he pointed at Mr. Bilyard. Defs.' L.R. 56(a)1 St. ¶ 37. Mr. Bilyard testified in his deposition that he put down the letter opener/knife before the CSP Sergeant switched from his Taser to his firearm, K. Bilyard Dep. Tr. at 107:10–108:1, though the police report written by Officer Pierce states that Mr. Bilyard dropped the object after the CSP Sergeant pointed his firearm at Mr. Bilyard and ordered him to drop it, ECF No. 32-8 at 3. It is undisputed that Mr. Bilyard, at some point, put down the letter opener/knife.

---

[7] Plaintiffs do not dispute that Mr. Bilyard remained upstairs, but Mr. Bilyard testified that, in response to Officer Pierce's orders, Mr. Bilyard repeatedly asked Officer Pierce why he was there, a question for which he received no answer. *See, e.g.*, K. Bilyard Dep. Tr. at 81:13–25.

[8] At his deposition, Mr. Bilyard testified that the Sergeant said, "I will tase you unless you get down here right now," and that, in response Mr. Bilyard said, "[I]f you keep on coming up here . . . I am going to defend myself." K. Bilyard Dep. Tr. at 103:19–20, 106:23–25.

According to Officer Pierce's police report, after Mr. Bilyard put down the knife, he "became more cooperative," *see id.*, and the CSP Sergeant and Officer Pierce then took Mr. Bilyard to the ground and handcuffed him. Defs.' L.R. 56(a)1 St. ¶ 38. Mr. Bilyard testified that both officers picked him up like he was a "rag doll" and "body slammed" him to the floor. K. Bilyard Dep. Tr. at 115:21–22, 117:5–6. He further testified that the wind was knocked out of him and he could not breathe, that he felt an officer's knees causing pain to his lower back, and that he was experiencing shoulder pain. *Id.* at 117:12–22, 120:21–121:8, 121:9–10. Mr. Bilyard was led outside while in handcuffs, and eventually placed in the back of an ambulance and taken to the hospital. Defs.' L.R. 56(a)1 St. ¶¶ 40–41.

At some point while Mr. Bilyard was engaged with Officer Pierce and the CSP Sergeant, Mrs. Bilyard also was handcuffed. *Id.* ¶ 39. Defendants contend that she was interfering with Defendants' and MCT's attempts to engage with Mr. Bilyard, including by blocking the stairway. *Id.* ¶¶ 28, 39. Two emergency medical technicians ("EMTs") who were present on site testified that Mrs. Bilyard was handcuffed when she was "trying to get to the bottom of the stairs," *see* Defs.' Mot. for Summary Judgment, Ex. J, B. Cieply Dep. Tr., ECF No. 32-12, at 34:6–8; *id.*, Ex. K, F. Vanormer Dep. Tr., ECF No. 32-13, at 29:4–8; and one noted that after being handcuffed, she sat on the couch. F. Vanormer Dep. Tr. at 28:15–20. Mrs. Bilyard testified in her deposition that she "screamed" after she heard officers take her husband down to the ground upstairs, J. Bilyard Dep. Tr., ECF No. 41-1, at 57:4–13, and then Officers Alfano and Critelli lifted her up, slammed her into the floor in front of her couch, pushed her face into the cushion, and handcuffed her, *id.* at 60:25–61:5. She further testified that she was yelling in pain, and in response Officer Critelli twisted her arm further and whispered in her ear: "This is your home, but you are not the boss. You don't belong here. I hate your kind." *Id.* at 62:21–63:6. Mrs. Bilyard also contends

5

that, while Officers Alfano and Critelli were handcuffing her, Officer Carter stood on the back of

Mrs. Bilyard's legs, *see* Defs.' Mot. for Summary Judgment, Ex. I, ECF No. 32-11, at 37 ¶ 127.

Mrs. Bilyard was also taken outside, and her handcuffs were eventually removed.  J. Bilyard Dep.

Tr. at 69.

Neither Mr. Bilyard nor Mrs. Bilyard were ever placed under arrest.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that a court "shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  A disputed fact is material only where the

determination of the fact might affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  With respect to genuineness, "summary judgment will not lie if the

dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*

In moving for summary judgment against a party who will bear the ultimate burden of

proof at trial, the movant's burden of establishing there is no genuine issue of material fact in

dispute will be satisfied if the movant can point to an absence of evidence to support an essential

element of the non-moving party's claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant bears an initial burden of "informing the district court of the basis for its motion, and

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact."  *Id.* at 323.  A movant, however, "need not prove a negative

when it moves for summary judgment on an issue that the [non-movant] must prove at trial.  It

need only point to an absence of proof on [the non-movant's] part, and, at that point, [the non-movant] must 'designate specific facts showing that there is a genuine issue for trial.'" *Parker v. Sony Pictures Ent., Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 324). The non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his or her favor. *Anderson*, 477 U.S. at 249. At times, a plaintiff's testimony may be "independently sufficient to raise a genuine issue of material fact." *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019). However, if the non-movant fails "to make a sufficient showing on an essential element of [their] case with respect to which [they have] the burden of proof," then the movant will be entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).

## B. Excessive Force

A claim for excessive force under 42 U.S.C. § 1983 is analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The Supreme Court has long noted that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. Thus, while some degree of physical force may be permissible, a "[p]olice officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their

underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (citing *Graham*, 490 U.S. at 397). In assessing the reasonableness of an officer's actions, courts must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (same). Further, the reasonableness of an officer's actions "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. As *Graham* recognizes, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. at 396–97.

### C. Failure to Intervene

All officers "have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As such, officers can be held liable for failing to intervene if they "observe[] or [have] reason to know . . . that excessive force is being used . . . [and have] a realistic opportunity to intervene to prevent the harm from occurring." *Id.*

## III.    MR. BILYARD'S CLAIMS

The Court holds that Officer Pierce is not entitled to summary judgment on Mr. Bilyard's claim for excessive force, though he is entitled to summary judgment for the claim for failure to intervene. Plaintiffs have raised a genuine issue of disputed material fact with respect to Mr. Bilyard's excessive force claim, such that a reasonable jury could find in their favor on this claim.

A. <u>Excessive Force</u>

Although this case presents a close question, the Court finds that there are material, disputed facts regarding whether Officer Pierce's use of force in taking Mr. Bilyard to the ground, handcuffing him, and transporting him out of the house after he dropped the letter opener/knife was reasonable.  Despite that Mr. Bilyard initially failed to comply with officers' orders to come downstairs, stated his intention to defend himself, and momentarily handled a potential weapon, there are genuine and material disputes over the amount of force used to take Mr. Bilyard to the ground and handcuff him, and whether force was applied to Mr. Bilyard after he was cooperative and handcuffed.  Although a reasonable jury may conclude that the force used was reasonable, the Court cannot make that determination as a matter of law on the record before it.

As to the first *Graham* factor—the severity of the crime at issue—the conduct that brought the officers to the Bilyards' home did not involve a crime, and therefore did not justify the use of *any* force.  *See Kew v. Town of Northfield, VT*, No. 5:19-CV-78, 2023 WL 4172741, at *23 (D. Vt. Apr. 17, 2023), *opinion vacated in part on other grounds on reconsideration*, No. 5:19-CV-78, 2023 WL 6050389 (D. Vt. July 10, 2023) (denying summary judgment on excessive force claim in part because individual on whom officers were performing wellness check had "committed no crime" justifying use of force to arrest her); *see also Lawhon v. Edwards*, 477 F. Supp. 3d 428, 446 (E.D. Va. 2020), *aff'd sub nom. Lawhon v. Mayes*, No. 20-1906, 2021 WL 5294931 (4th Cir. Nov. 15, 2021) (noting that the "justification for the seizure," which was to "prevent a mentally ill man from harming himself," provided no "vindicat[ion] for any degree of force that risks substantial harm to the subject") (quoting *Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899–901 (4th Cir. 2016)).

The second and third factors, however, may support the application of some force to Mr. Bilyard. *See Graham*, 490 U.S. at 396; *see also Lawhon*, 477 F. Supp. 3d at 446. On the second factor—whether there was a potential threat to the safety of the officer or others—there was at least some risk that Mr. Bilyard would harm himself or an officer. First, Officer Pierce arrived at the house to investigate a concern that Mr. Bilyard may pose a threat to himself, due to the call the Southbury Police Department had received from Dr. McKenzie. *See* ECF No. 34-2.[9] At no point in time, even construing the facts in the light most favorable to Plaintiffs, did Mr. Bilyard clearly dissuade officers that no such threat existed. It was objectively reasonable for Officer Pierce to interpret Mr. Bilyard's admitted agitation as further evidence that Mr. Bilyard posed a potential threat to himself. Moreover, Mr. Bilyard has conceded that he at least picked up the letter opener/ knife that the officers could have reasonably interpreted as a potential weapon. Even assuming that Mr. Bilyard put it down quickly, as he suggests, his action of picking it up and stating that he was going to "defend himself" lends support to the contention that he posed a threat to officers, justifying the use of some force to effect his transport to the hospital.

As to the third *Graham* factor, Mr. Bilyard's resistance to complying with officers' commands is a further reason to justify the use of some force to detain him and transport him outside to the ambulance. Although Mr. Bilyard and Mrs. Bilyard both testified at length to their fear, and the allegedly terrifying "tone" the officers used during the interaction, *see, e.g.*, K. Bilyard Dep. Tr. at 110; J. Bilyard Dep. Tr. at 52, they ultimately do not dispute that Mr. Bilyard was

---

[9] Plaintiffs do not challenge the warrantless seizure of Mr. Bilyard for the purposes of involuntary hospitalization; accordingly, the Court assumes there was probable cause for the seizure itself and analyzes only whether the force used in effecting it was excessive. *See Anthony v. City of New York*, 339 F.3d 129, 137 (2d Cir. 2003) (noting that a "warrantless seizure for the purpose of involuntary hospitalization" may be made "upon probable cause . . . if there are reasonable grounds for believing that the person seized' is dangerous to herself or to others") (citation omitted); *Waananen v. Barry*, 343 F. Supp. 2d 161, 171 (D. Conn. 2004), *aff'd sub nom. Madsen v. Barry*, 160 F. App'x 102 (2d Cir. 2005) (granting summary judgment for defendants with regard to involuntary hospitalization claim where, even though plaintiff was "apparently rational" and "calm," information available to officer from "a short time earlier that day" gave them probable cause to believe plaintiff may be contemplating harm to himself or others).

ordered to come downstairs and would not do so, *see, e.g.*, K. Bilyard Dep. Tr. at 81, 91. Similarly, they do not dispute that Mr. Bilyard threatened to defend himself once the officers began approaching him. This threat, coupled with Mr. Bilyard's momentary grabbing of a potential weapon, was enough to make taking Mr. Bilyard to the ground and handcuffing him temporarily reasonable, under the circumstances. *See Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000) (recognizing that resisting and threatening a police officer in the course of an arrest "no doubt justifies the officer's use of *some* degree of force," though not "force without limit"); *Lawhon*, 477 F. Supp. 3d at 446 (noting that it was "objectively reasonable" for "some force" to be applied in detaining individual who refused to be taken into custody and resisted attempts to be secured).

Although the Court finds that the application of the *Graham* factors here may have warranted the handcuffing of Mr. Bilyard as a general matter, there remain genuine disputes of fact as to whether the manner of handcuffing, and any force used post-handcuffing, was objectively reasonable. The parties agree that Mr. Bilyard was taken to the ground *after* he had dropped the potential weapon and become cooperative. *See* Defs.' L.R. 56(a)1 St. ¶ 38; ECF No. 32-8 at 3; K. Bilyard Dep. Tr. at 114:8–11. And while Defendants describe this sequence of events as simply taking a cooperative Mr. Bilyard to the ground and handcuffing him,[10] Mr. Bilyard, through his testimony and interrogatory responses, paints a very different picture in which Officer Pierce and the CSP Sergeant picked him up, "body slammed [him] to the floor" so hard that it knocked the wind out of him, pressed their knees on his back and arms on his neck while he was on the ground, and, once he was handcuffed, painfully and repeatedly "twisted" the handcuffs to lead him outside

---

[10] Notably, the police report submitted by Officer Pierce regarding the incident describes Mr. Bilyard "immediately dropp[ing] the knife on the ground" upon being ordered to do so by the CSP Sergeant, then becoming "cooperative" and "getting on the ground in a supine position," before being handcuffed. ECF No. 32-8 at 3. This evidence that Mr. Bilyard may have gotten on the ground of his own accord before being handcuffed is in conflict with the sequence of events described in Defendant' Rule 56(a)1 Statement, which cites to the police report and Mr. Bilyard's testimony.

while he complained of significant pain. *See* K. Bilyard Dep. Tr. at 115:21–22, 117:5–22, 120:23–25, 121:9–14, 124:4–13; Pls.' Interrogatory Responses, ECF No. 32-11 at 19–21.

The Court cannot resolve this factual dispute at this stage. Viewing the record in the light most favorable to Plaintiffs, as the Court must on summary judgment, *see Kee*, 12 F.4th at 158, the Court finds that a reasonable jury *could* accept Mr. Bilyard's account and find that this use of force against an (at that time) non-resistant individual was objectively unreasonable. *See Rogoz v. City of Hartford*, 796 F.3d 236, 248 (2d Cir. 2015) (reversing district court's grant of summary judgment on qualified immunity grounds because, "it is surely at least arguable" that "if [officer] jumped on the back of the prone, compliant [plaintiff]," the force used was excessive); *Maxwell*, 380 F.3d at 108, 109 ("jury should assess [plaintiff's] account of what occurred during her arrest," where plaintiff alleged she was "swung and jerked" around "by the handcuffs" and "shoved" into a police car); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123–24 (2d Cir. 2004) (reversing district court's grant of summary judgment where one plaintiff was allegedly thrown to the ground face-down and another had an officer's knee on his neck "in order to tighten his handcuffs while he was lying face-down")[11]; *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987) (Plaintiff's assertions that she was "pushed" up against a car and her arms were twisted were "sufficient to prevent the summary dismissal of a § 1983 claim for excessive force," in part because "[r]esolution of credibility conflicts . . . are matters for the jury"); *Kew*, 2023 WL 4172741, at *22–*23 (denying summary judgment regarding allegedly rough handcuffing because "where [plaintiff] had committed no crime, posed no safety risk to the officers, and was not trying to

---

[11] In deciding *Amnesty America* twenty years ago, the Second Circuit chastised Attorney Williams for submitting deficient briefing. 361 F.3d at 132–34. Ultimately, the Second Circuit, like this Court, opted to consider the merits of the appeal because declining to consider them would "unfairly penalize plaintiffs for Williams's failings as an advocate." *Id.* at 133. As is apparent from Attorney Williams's seven-page opposition brief in this case, he appears not to have taken the Second Circuit's words to heart. While the Court has no obligation to review the entire record when counsel does not point to the relevant portions, it has nonetheless done so here, so as not to penalize Plaintiffs for their former attorney's failings.

escape, a reasonable jury could find that [] the officers did not need to use *any* force when they did, let alone the amount of force that they used"). *Cf. Lagasse v. City of Waterbury*, No. 3:09-CV-391 (VLB), 2011 WL 2709749, at \*8 (D. Conn. July 12, 2011) (granting summary judgment for officers where it was "undisputed that [officer] ceased to use physical force once [plaintiff] was subdued," and citing analogous cases). Of course, a jury would also be free to conclude that, given the circumstances and Mr. Bilyard's "resistance techniques," *see Amnesty America*, 361 F.3d at 124, the force used was reasonable. But that issue is for the jury, and not this Court, to decide.

Lastly, the Court finds that a jury could conclude the injuries allegedly suffered by Mr. Bilyard because of this encounter were more than *de minimis*—though, on this record, it is once again a close call. Plaintiffs claim that Mr. Bilyard, as a result of this encounter, suffered injuries to a previously torn rotator cuff, a possibly cracked vertebrae,[12] bruises, ongoing shoulder pain, and emotional distress, in addition to the pain experienced during the incident. *See* ECF No. 32-11 at 44–45; K. Bilyard Dep. Tr. at 121, 124; 203:8–15. The Court notes that Plaintiffs have not submitted medical records or evidence of any of these injuries from the incident aside from Mr. Bilyard's responses to interrogatories and deposition testimony. Again, while the jury can consider the weight (or lack thereof) of this evidence at trial, Mr. Bilyard's account is enough to create an issue of fact at this stage, *see Bellamy*, 914 F.3d at 746, and courts have found analogous injuries to be more than *de minimis*. *See Robison*, 821 F.2d at 924 (reversing district court's grant of summary judgment where plaintiff suffered "bruises lasting a couple weeks," and noting that "[i]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe"); *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 448 (D.

---

[12] During his deposition, Mr. Bilyard stated that there was a "question" of whether the "officers' knees" being "put into [his] lower back" caused a cracked vertebrae which required multiple surgeries. K. Bilyard Dep. Tr., ECF No. 41, at 203:8–15.

Conn. 2013) (noting that, "[e]ven though the evidence of [plaintiff's] alleged injuries" was "weak," issues of fact regarding whether officer "used excessive force in handcuffing [plaintiff]" precluded summary judgment).

Accordingly, Defendants' motion for summary judgment is DENIED as to the excessive force claim against Officer Pierce.  In so holding, the Court recognizes that this appears to have been a tense situation in which Officer Pierce needed to make quick judgments.  A jury may ultimately determine that these judgments were reasonable but, for the reasons discussed herein, the Court concludes that there are disputes of fact as to the force used after Mr. Bilyard stopped resisting, such that a reasonable jury could find in Mr. Bilyard's favor on his excessive force claim.

### B.  Failure to Intervene

Although Mr. Bilyard has identified a potential direct Fourth Amendment violation as to Officer Pierce, his failure to intervene claim against Officer Pierce fails.  As Mr. Bilyard did not bring a claim against the CSP Sergeant related to the Sergeant's actions, and there has therefore been no finding of a constitutional violation by the Sergeant,[13] Officer Pierce "cannot be held liable for failing to intervene to prevent a violation of those rights."  *See Ferraresso*, 646 F. Supp. 2d at 308; *see also Anderson*, 17 F.3d at 557.

Accordingly, Defendants' motion for summary judgment is GRANTED as to the failure to intervene claim against Officer Pierce.

---

[13] The Court notes that, as to the pointing of the Taser and the gun at Mr. Bilyard by the CSP Sergeant, these acts do not constitute excessive force because the weapons were never used on Mr. Bilyard.  *See, e.g.*, *Pierre v. City of New York*, 531 F. Supp. 3d 620, 627 (E.D.N.Y. Mar. 13, 2021) ("threats of force, including the drawing of a gun, cannot constitute excessive force as a matter of law"); *Easton v. City of New York*, No. 05-CV-1873 (FB) (JMA), 2009 WL 1767725, at *4 n.5 (E.D.N.Y. June 23, 2009) (noting that while other circuits have occasionally recognized excessive force claims in situations where officers point guns at individuals, "[t]he Second Circuit has never before recognized such a claim").

IV.   **MRS. BILYARD'S CLAIMS**

The Court likewise holds that Defendants are not entitled to summary judgment as to Mrs. Bilyard's claims for excessive force and failure to intervene against Officers Alfano, Critelli, and Carter, as Plaintiffs have demonstrated a genuine dispute of material fact that must be resolved by the jury.

A.   Excessive Force

Significant factual disputes persist as to the actions undertaken by Officers Alfano, Critelli, and Carter, who were engaged with Mrs. Bilyard while Officer Pierce and the CSP Sergeant were engaged with Mr. Bilyard.

First, there is a dispute about Mrs. Bilyard's level of interference with the officers' efforts to engage with Mr. Bilyard.  *See* ECF No. 32-1 at 17.  Although Mrs. Bilyard admitted that she was attempting to communicate with her husband from the bottom of the stairs in a variety of ways during the encounter, *see* ECF No. 32-11 at 35 ¶ 110; *id.* at 39 ¶ 142; J. Bilyard Dep. Tr. at 57:4–13, and third parties indicated Mrs. Bilyard was interfering, *see, e.g.*, F. Vanormer Dep. Tr. at 28:3–10, Mrs. Bilyard generally denied that she was interfering in any way, *see* ECF No. 32-11 at 39 ¶ 142.  Her level of interference with the police is therefore a genuinely disputed material fact.

Moreover, even assuming that it was a "reasonable protective measure" to handcuff Mrs. Bilyard during the incident, *see Lagasse*, 2011 WL 2709749, at *7, genuine issues of fact also exist as to the amount of force used against Mrs. Bilyard during and after the handcuffing. Throughout her interrogatory responses, ECF No. 32-11, and deposition testimony, ECF No. 41-1, Mrs. Bilyard describes a markedly different encounter from the one described by the EMTs on the scene, *see generally* B. Cieply Dep. Tr. and F. Vanormer Dep. Tr.  For instance, one EMT testified that Mrs. Bilyard was "walked" to the couch by one officer, "rolled onto her front," sat

down after being handcuffed, and eventually calmed down.  *See* F. Vanormer Dep. Tr. at 28:18–23, 29:14–19.  On the other hand, Mrs. Bilyard recounts a series of events in which three officers roughly handcuffed her too tightly, stood on the back of her legs, held her face into the couch such that she could not breathe, and repeatedly twisted her arms while she was handcuffed, while she screamed and told the officers she was in pain.  *See, e.g.*, ECF No. 32-11 at 35–38.  Some of the force described by Mrs. Bilyard, including the arm-twisting, and potentially Officer Carter standing on the back of her legs,[14] appears to have occurred after she was handcuffed, which may be further evidence that the force was excessive.  *See, e.g.*, *Jones v. City of Hartford*, 285 F. Supp. 2d 174, 181 (D. Conn. 2003) (noting that there was "no question" plaintiff's excessive force claim survived summary judgment where, in part, plaintiff was "already cuffed" when force occurred, and there was no evidence of resistance or flight).[15]

Defendants have put forth no evidence to suggest that, like Mr. Bilyard, Mrs. Bilyard was resisting arrest or threatening to defend herself.  Also, again unlike Mr. Bilyard, officers had no reason to believe that Mrs. Bilyard posed a threat of harm to herself or others.  The Court further notes that Defendants have cited to no case law, nor has the Court located any, which suggests that this kind of force against a non-threatening bystander in a non-criminal, non-arrest situation, is objectively reasonable.  Thus, applying the *Graham* factors, the Court cannot determine as a matter of law that the use of force against Mrs. Bilyard was objectively reasonable in this case.

---

[14] Mrs. Bilyard stated at her deposition that Officer Carter stepped on her legs *after* she was already handcuffed, *see* J. Bilyard Dep. Tr. at 64:15–20, but her interrogatory responses state that Officer Carter did this *while* she was being handcuffed, *see* ECF No. 32-11 at 37 ¶ 127.  While discrepancies in a plaintiff's own statements cannot alone create a genuine dispute of material fact, *see Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996), the nature and timing of the encounter does appear genuinely disputed, when Mrs. Bilyard's account is compared to those of the third parties who were present.

[15] The comments and personal attacks Mrs. Bilyard alleges Officer Critelli said to her during the encounter, *see, e.g.*, J. Bilyard Dep. Tr. at 62:21–63:6, while clearly offensive, only go to Officer Critelli's subjective motivations and intent, and are thus irrelevant to any claim for excessive force or failure to intervene.  *See Graham*, 490 U.S. at 397 (noting that the "subjective motivations of the individual officers . . . has no bearing" on objective unreasonableness under the Fourth Amendment).

Defendants emphasize that the EMTs and the MCT, who reported that Mrs. Bilyard was interfering with the officers' attempts to engage Mr. Bilyard, were "disinterested third parties," potentially suggesting that the Court should weigh their testimony more heavily than the Plaintiffs'. *See, e.g.*, ECF No. 32-1 at 19.  However, Defendants cite to no support for that suggestion and, in fact, the Court is required to *not* weigh credibility issues at the summary judgment stage, as that is the province of the jury. *See Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.") (citation omitted).  Thus, the fact that third parties testified that the events unfolded in a manner far different than how Mrs. Bilyard reports serves only to illustrate the existence of a factual dispute that cannot be resolved at summary judgment.

### B.  Failure to Intervene

Given that the Court will allow Mrs. Bilyard's excessive force claim to proceed against Officers Alfano, Critelli, and Carter, the Court will likewise allow Mrs. Bilyard's failure to intervene claim to proceed against these three officers.  Although Defendants are correct in pointing out that the positioning of the three defendants as to Mrs. Bilyard is not abundantly clear, *see* ECF No. 32-1 at 21, the evidence submitted indicates that all three defendants were close to and engaged with Mrs. Bilyard during and after her handcuffing, while she was still in the house, *see, e.g.*, ECF No. 32-11 at 37 ¶ 127, and that at least Officers Critelli and Alfano were with her as she was taken outside of the house and to the car.  *See id.* at 38 ¶ 139.  During this time, she claims numerous discrete instances of force:  the rough handcuffing, the handcuffs being placed too tight, Officer Carter standing on the back of her legs, and Officer Critelli twisting her arm multiple times.  *See* ECF No. 32-11 at 35–38.  Accepting Mrs. Bilyard's account that the officers

were all in close proximity to each other and her during this time, the Court finds that Defendants are not entitled to summary judgment on Mrs. Bilyard's failure to intervene claims, as she has sufficiently raised the issue of whether each of the three defendants witnessed and had a "realistic opportunity" to intervene in any of the discrete actions committed by the other officers. *See Jones*, 285 F. Supp. 2d at 182–83 (finding no failure to intervene in discrete use of force where there was no evidence that officers "were aware of or able to see" the alleged beating, or that they were close enough to intervene, but finding failure to intervene claim survived summary judgment for uses of force that officers could see and had been "alerted" to by plaintiff's yelling).

## V.      QUALIFIED IMMUNITY

All Defendants assert that, even if they are found to have violated Plaintiffs' constitutional rights, they are entitled to summary judgment because they are protected by qualified immunity. The Court finds that, as the same questions of material fact that permeate the Fourth Amendment inquiries also permeate the qualified immunity questions, the Court cannot grant summary judgment for Defendants on this ground.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity defense has evolved to provide "protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). In assessing a defendant's entitlement to qualified immunity on summary judgment, the court must "consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (cleaned up). A right is "clearly established if

the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (cleaned up).

In the context of an excessive force claim, the federal right at issue is the Fourth Amendment right against unreasonable seizures, and the inquiry must focus on "the specific factual situation the officers confronted." *Id.* at 739 (cleaned up). A defendant will be entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 584 U.S. __, 138 S. Ct. 1148, 1153 (2018) (citation omitted).

Notably, there is existing precedent squarely stating that the use of significant force against a restrained or subdued individual is barred by the Fourth Amendment. *See, e.g.*, *Lennox v. Miller*, 968 F.3d 150, 156–57 (2d Cir. 2020) (holding that "[o]n July 22, 2016, it was therefore clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting"); *Rogoz*, 796 F.3d at 250–51 (reversing grant of qualified immunity and noting that "actions by officers far less extreme than jumping on the back of a prone and compliant suspect, and apparently resulting in injuries far less serious than broken spines and ribs, [have] long been held sufficient to support a Fourth Amendment claim of use of excessive force"); *Mael v. Howard*, No. 18-CV-378 (JLS) (LGF), 2022 WL 263235, at *6 (W.D.N.Y. Jan. 27, 2022) (noting that, "[i]n many cases in which the courts conclude that qualified immunity does not apply, plaintiffs allege gratuitous force when the plaintiffs no longer are a threat or show resistance," and citing cases).

As to Mr. Bilyard, the Court has found that there are material disputes of fact as to which acts of force occurred, and how much force Officer Pierce used to take a then-cooperative Mr. Bilyard down to the ground, to restrain and handcuff him, and to transport him out of the house.

19

In general, summary judgment on the basis of qualified immunity is "precluded" if material facts are "still in dispute" which directly "implicate the reasonableness of the officers' use of force." *See Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999). Here, that is precisely the case. Because a jury could determine that Officer Pierce's use of force against Mr. Bilyard occurred after he ceased resisting and was handcuffed, the Court cannot at this time grant Officer Pierce qualified immunity, because a reasonable officer would understand that those actions would violate clearly established law.

The same holds true for Officers Alfano, Critelli, and Carter. There are genuine disputes of material fact as to the amount of force used to handcuff and subdue Mrs. Bilyard, and used against her post-handcuffing. If Mrs. Bilyard's account is fully credited by a jury, it would find that the officers violently threw to the ground, smothered, handcuffed, and injured a non-violent, non-resistant, non-interfering bystander to a wellness check—actions any reasonable officer would know violate clearly established law. On the other hand, a jury could determine that officers (or one officer) briefly, and appropriately, detained an interfering individual in order to secure a tense and fast-moving situation. The jury will eventually have to decide between these competing accounts. At this stage, these factual disputes directly "implicate the reasonableness of the officers' use of force" in this instance, and preclude issuance of summary judgment in favor of Officers Alfano, Critelli, and Carter. *See id*.

Accordingly, the defense of qualified immunity is not a basis upon which to grant summary judgment in favor of Defendants.

## VI.     CONCLUSION

For the reasons described herein, Defendants' motion for summary judgment is GRANTED in part, as to the failure to intervene claim against Defendant Pierce, and DENIED in all other respects.  The Court will schedule a status conference with the parties to discuss the schedule for pretrial filings and trial.

**SO ORDERED** at Hartford, Connecticut, this 13th day of February, 2024.


　　　　　　　　　　　　　 */s/ Sarala V. Nagala*　　　　　　
　　　　　　　　　　　　　 SARALA V. NAGALA
　　　　　　　　　　　　　 UNITED STATES DISTRICT JUDGE